# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

LAWRENCE LING,                          )
                                        )
      **Plaintiff,**                     )
                                        )
v.                                      )      **Civil No. 3:13-cv-0839**
                                        )      **Judge Aleta A. Trauger**
                                        )
LIFE INSURANCE COMPANY OF               )
NORTH AMERICA,                          )
                                        )
      **Defendant.**                     )

## MEMORANDUM

Pending before the court is defendant Life Insurance Company of North America's

Motion for Judgment on the Administrative Record (Docket No. 15), to which plaintiff Lawrence

Ling has filed a Response (Docket No. 25), and the defendant has filed a Reply (Docket No. 26).

For the reasons that follow, the motion will be granted.

## BACKGROUND

This action – brought under the civil enforcement provisions of the Employee Retirement

Income Security Act, 29 U.S.C. § 1132 *et seq*. ("ERISA") – concerns long term disability

benefits.[1]

Plaintiff Lawrence Ling ("Ling") is a fifty-eight year old resident of Davidson County,

Tennessee. Ling is a former forklift operator for Associated Wholesale Grocers, Inc. ("AWG")

---

[1] While the parties disagree as to certain conclusions to be drawn therefrom, the facts of this matter are essentially undisputed. The administrative record ("AR") is a significant body of documentary evidence; for the sake of efficiency, the court only recites the facts it deems necessary for disposition of the pending motion.

and a participant in the AWG Employee Welfare Plan (the "Plan"), which is governed by ERISA. Defendant Life Insurance Company of North America ("LINA") is a corporation headquartered in Philadelphia County, Pennsylvania. LINA is the insurer and disability claims administrator for the Plan.[2]

Ling maintains that he is disabled as a result of, *inter alia*, degenerative disc disease of the cervical and lumbar spine. After conducting a review of Ling's file, LINA denied his claim for LTD benefits on August 17, 2011, finding that Ling's medical evidence was insufficient to support a continuous level of functional impairment that would have precluded him from employment throughout his mandatory benefits waiting period ("Elimination Period"). AR at 146-48. Ling appealed to LINA, but his appeal was denied. Ling filed this lawsuit on August 22, 2013, alleging wrongful denial of LTD benefits.

A.      **Applicable Plan Provisions**

Under the Plan, a disability insurance claimant "is considered Disabled if, solely because of Injury or Sickness, he or she is either: 1. unable to perform all the material duties of his or her Regular Occupation; and 2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation." (AR at 422.) The Plan defines Regular Occupation as the "occupation the Employee routinely performs at the time the Disability begins. In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy."[3] (AR at 444.)

---

[2] The Plan Administrator has appointed LINA as the named fiduciary for deciding claims for benefits under the Plan and for deciding any appeals of denied claims. (AR at 446.)

[3] After 24 months of receiving disability payments, the definition of "Disability" changes:
"[a]fter Disability Benefits have been payable for 24 months, the Employee is considered

In order to receive benefits, a claimant must be continuously disabled throughout the initial ninety-day Elimination Period.  (AR at 431, 422.)

The Plan states that a claimant "must provide [LINA], at his or her own expense, satisfactory proof of Disability before benefits will be paid."  (AR at 431.)  Claimants may also be required from time to time to provide LINA with proof of continued disability.  (AR at 422.)

## B.    Ling's Medical Record

Ling worked in the cold storage frozen foods section of AWG for the first twenty years of his career.  (AR at 237.)  In 1998, Ling developed lower back problems and had corrective surgery under the care of Dr. Thomas J. O'Brien at the Summit Medical Center in Hermitage, Tennessee.  (AR at 237-38.)  After returning to work, Ling was transitioned to driving a sitdown forklift truck until approximately 2008, when Ling was assigned to drive a standup forklift truck.  (AR at 237.)  When he transitioned to the standup forklift in 2008, Ling had a back pain flare-up and missed approximately eight weeks of work while receiving treatment.  (AR at 237.)  He then went back to work.  (AR at 237.)  In approximately April of 2011, Ling claimed that he started experiencing pain in his back with no specific injury and sought medical treatment.  (AR at 237.)

### 1.    Dr. Paul Parsons and Dr. John Klekamp

On May 25, 2011, Ling saw Dr. Paul Parsons of the Vanderbilt Bone and Joint Clinic as a walk-in patient, with complaints of back pain.  (AR at 305-07.)  Dr. Parsons concluded there was not much he could do for Ling orthopedically, gave Ling a shot of anti-inflammatory medication

---

Disabled if, solely due to your [sic] Injury or Sickness, he or she is: 1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and 2. unable to earn 80% or more of his or her Indexed Covered Earnings."  (AR at 422.)

to "calm down his symptoms," and told Ling to stay out of work for two weeks until he saw his

colleague, Dr. John Klekamp. (AR at 305-07.) Ling saw Dr. Klekamp on June 7, 2011. (AR at

307-08.) Dr. Klekamp found no evidence of obvious spinal deformity. (AR at 307.) On that

date, Dr. Klekamp's assessment included the various observations that Ling: (1) appeared "very

comfortable" and "in no distress at all"; (2) looked "like he was in no pain at all"; (3) got up from

a seated position "without any pain or encumbrances"; (4) "walked down the hall in a

nonantalgic gait"; (5) did "not grimace"; and (6) did "not appear to be in any pain." (AR at 307.)

Dr. Klekamp's physical examination resulted in findings of "full range of motion" for the neck,

mid-back, and low back, as well as negative Lhermitte's and Spurling's tests.[4] (AR at 307.) Dr.

Klekamp's review of x-ray imaging resulted in a conclusion of "age appropriate degenerative

[cervical] changes." (AR at 308.) Dr. Klekamp concluded that Ling could "return to work with

less than 10 pounds lifting, no prolonged standing and less than four hours standing per day for

the next month." (AR at 308.) Dr. Klekamp noted, however, that Ling "argued repeatedly that

he does not get paid unless he is taken off work. He states that they do not have light duty at

work unless you injured yourself at work." (AR at 308.) *Id.* Dr. Klekamp concluded, "[a]fter a

prolonged discussion with myself regarding his inability to [sic] his feelings that he is unable to

work, I have relented and provided a note to be off work until he returns to see me." (AR at 308.)

---

[4] A Lhermitte's test is performed to check for cervical spine disorders. *See* Supreet
Khare and Deeksha Seth, Lhermitte's Sign: The Current Status, 18(2) ANN. INDIAN ACAD.
NEUR. 154 (2015), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4445188/ (last
accessed September 8, 2015). A Spurling's test is performed to assess cervical nerve root pain.
*See* http://www.pthaven.com/page/show/161709-spurling-s-test (citing D.J. Magee,
ORTHOPEDIC PHYSICAL ASSESSMENT (5th ed. 2008)) (last accessed September 8, 2015).

On July 1, 2011, Ling returned to see Dr. Klekamp.  (AR at 308-09.)  Dr. Klekamp observed that Ling "appear[ed] very comfortable" despite complaints of back pain.  (AR at 308-09.)  On physical examination, Dr. Klekamp found that Ling could bend forward and had "full range of motion of his cervical and lumbar spine."  (AR at 309.)  Dr. Klekamp stated in the record that he "suggested [Ling] return to work," but that Ling stated he was in too much pain and needed to remain out of work.  (AR at 309.)  Dr. Klekamp referred Ling for a magnetic resonance imaging ("MRI") of his lumbar spine.  (AR at 309.)

On July 12, 2011, having undergone the lumbar spine MRI, Ling returned to see Dr. Klekamp.  (AR at 309-10.)  Dr. Klekamp's notes from this visit, however, reflect that Ling was "not mentioning much about his back" and "now describes neck discomfort [that h]e did not mention during his last visit."  (AR at 309-10.)  According to Dr. Klekamp, Ling said "[h]e is not sure that he can return to work because when he looks up it hurts," although "[w]hen he is looking straight forward he is not in much pain."  (AR at 309.)  Ling told Dr. Klekamp that he had not mentioned this problem during prior visits because Dr. Klekamp had never asked.  (AR at 309.)  Dr. Klekamp noted that he "asked [Ling] specifically about his back" and that Ling "[did] not describe much in the way of back pain at this time."  (AR at 309-10.)  Dr. Klekamp reviewed Ling's lumbar spine[5] MRI results and stated that he saw only mild-to-moderate L2-3 foraminal narrowing,[6] mild L3-4 and L4-5 disc bulges with only mild to moderate foraminal narrowing, L5-

---

[5] The lumbar spine, commonly referred to as the lower back, consists of five vertebrae numbered L1 through L5.  The spaces between these vertebrae contains discs.  The L5 vertebrae adjoins the upper sacral vertebrae, which is referred to as S-1.  *See* GALE ENCYCLOPEDIA OF MEDICINE (2008), available at http://medical-dictionary.thefreedictionary.com/lumbar+spine (accessed on September 8, 2015).

[6] Foraminal narrowing, also referred to as spinal stenosis, is a condition of the spine that can occur when the space available for nerve roots to branch off the spinal cord and exit the

S1 no area of foraminal narrowing, no fractures, no marrow replacement lesions, and no area of significant nerve impingement.[7]  (AR at 310.)  Dr. Klekamp wrote in his notes that, while Ling now requested to be off of work for his neck pain, "I think he can return to work."  (AR at 310.) *Id.*  Dr. Klekamp nevertheless referred Ling for a cervical spine MRI.  (AR at 310.)

On July 15, 2011, after receiving the cervical spine MRI, Ling returned to see Dr. Klekamp.  (AR at 311.)  Dr. Klekamp noted that Ling returned with "gradual improvement of his neck and low back pain."  (AR at 311.)  Dr. Klekamp reviewed Ling's cervical spine[8] MRI results and noted that he found C4-5 mild anterolisthesis with mild-to-moderate foraminal narrowing, C5-6 moderate disc degeneration, and C6-7 diffuse disc bulge with mild-to-moderate bilateral foraminal narrowing.[9]  (AR at 311.)  Dr. Klekamp "suggested return to work with treatment with Lodine anti-inflammatories" and, because there was "no area for reliable surgical intervention," suggested a consultation with a pain management physician for possible injection "if he does not improve and requires future treatment options."  (AR at 311.)

---

spinal column becomes constricted.  This is also known as spinal nerve root compression.  *See* http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105 (last accessed September 8, 2015).

[7] Dr. Klekamp noted that his interpretation disagreed with one aspect of the interpretation of a radiologist who also reviewed the MRI results and noted "intermittent moderate narrowing." AR at 310.

[8] The cervical spine, commonly referred to as the neck, begins at the base of the skull and consists of seven vertebral segments numbered C1 through C7.  The spaces between these vertebrae contains discs.  *See* MCGRAW-HILL CONCISE DICTIONARY OF MODERN MEDICINE (2002), available at http://medical-dictionary.thefreedictionary.com/cervical+spine (last accessed September 8, 2015).

[9] Dr. Klekamp noted that his interpretation disagreed with one aspect of the interpretation of a radiologist who also reviewed the MRI results and noted "more severe foraminal narrowing."  AR at 311.

### 2.    Physical Therapy

On June 13, 2011, pursuant to Dr. Klekamp's orders, Ling began physical therapy at Star Physical Therapy.  (AR at 338.)  Ling presented to his physical therapist with "pain and stiffness" that was "intermittent in the neck and scapular area" and "constant in the lower back."  (AR at 340.)  Ling stated that his neck was better when looking straight ahead.  (AR at 340.)  Ling further stated that his lower back was better "while walking" and "as the day progresses."  (AR at 340.)  On June 14, 2011, Ling reported to his physical therapist a soreness in his calves that he stated may have been caused by "walking a lot recently."  (AR at 343.)  After this session, the physical therapist noted that Ling's "pain abolished in the [lower back] and calf tightness abolished."  (AR at 345.)  On June 17, 2011, at the start of the session, the physical therapist noted that "the patient reports no pain only stiffness in center of spine and center of [lower back]."  (AR at 346.)  At the conclusion of the session, the physical therapist noted that Ling reported "decreased stiffness in his neck and back."  (AR at 346.)

On June 27, 2011, Ling reported to his physical therapist that, although he had woken up with some pain, he currently had (1) no pain and just stiffness in his neck and (2) no pain or stiffness in his lower back.  (AR at 349.)  Ling stated that his "back pain is 60% better and neck pain is 30% better."  (AR at 349.)  He further reported that his pain "ha[d] become intermittent and not as bad."  (AR at 349.)  The physical therapist noted that Ling had "no difficulty or pain with any of the exercises performed."  (AR at 351.)  On June 29, 2011, the physical therapist noted that, after a session that included performing a full range of exercises including hip hinges and box squats, Ling had "no complaints of pain, only muscle soreness in the thighs."  (AR at 352.)  On June 30, 2011, the physical therapist noted that Ling "currently reports no pain."  (AR

at 353.)

On July 6, 2011, the physical therapist's notes reflect that Ling reported that "his neck is just stiff and [his] lower back [is] 35% better since starting [physical therapy]." (AR at 356.) The therapist delineated that Ling "functionally report[ed] sitting tol[erance] of about [one] hour, he ha[d] no difficulty [with] household activities, [and] he report[ed] that he has no pain in turning his head while driving." (AR at 356.) On that day, the physical therapist reported clinical results of 100% percent cervical range of motion in all categories (flexion, extension, right rotation, left rotation, right lateral flexion, and left lateral flexion) except retraction, which was reported to be ninety percent. (AR at 356.)

On July 7, 2011, Ling reported to his physical therapist that he was "sore and stiff all over and not sure what caused the increased stiffness." (AR at 359.) However, the physical therapist noted that Ling had "no complaints of pain during the session." (AR at 360.) At his July 8, 2011, physical therapy appointment, Ling reported soreness and stiffness in his lower back and neck, but "tolerated treatment well" (including "4/10 pain in neck during treatment and soreness in back when performing sit to stand with hip hinge"). (AR at 362.) On July 11, 2011, Ling reported "no stiffness or pain currently," although he stated that there had been some stiffness in the morning. (AR at 363.) The physical therapist noted that, after the treatment, Ling "report[ed] no pain" and "stiffness in his legs." (AR at 363.) There are no details of additional therapy visits in the Administrative Record.

### 3. Dr. Son Le

On July 25, 2011, Ling saw Dr. Son Le, of the Center for Spine, Joint and Neuromuscular Rehabilitation, for a pain management consultation (as suggested by Dr. Klekamp). (AR at 258-

59.)  Dr. Le's physical examination yielded the following observations: "Normal range of motion of the cervical spine in all planes; end ranges of motion tenderness noted.  Negative bilateral Spurling's maneuver.  Soft tissue were supple but palpable tenderness over the base of the neck and upper shoulders.  Normal examination of the shoulder joints.  Muscle stretch reflexes, manual muscle testings, sensation to pinprick for the bilateral upper extremities were within normal limits."  (AR at 258.)  Dr. Le recommended and administered an epidural steroid injection to treat Ling's reported pain.  (AR at 258-59.)  Dr. Le also wrote to Dr. Klekamp and suggested changing Ling's pain medicine prescription to Celebrex so that Ling could supplement it with over-the-counter Tylenol.  (AR at 259.)  Dr. Le instructed Ling to return in one to two weeks and wrote a note excusing Ling from work until the next appointment.  (AR at 258-59.)

There is no documentation in the Administrative Record of Ling's returning to see Dr. Le until August 29, 2011, when he received another epidural injection.  (AR at 260.)  Ling also returned to Dr. Le for epidural injections on September 12, 2011 and September 26, 2011.  (AR at 261-62.)  Ling next saw Dr. Le on October 10, 2011.  (AR at 263.)  At this time, Ling reported to Dr. Le that the epidural injections had been providing him with forty percent relief at first and remained twenty percent effective.  (AR at 263.)  Ling also stated that starting the prescription pain medicine Celebrex had "helped to ease his pain."  (AR at 263.)  Ling reported an average pain of "4/10 where 10 is the worst possible pain," including a "constant aching in his neck that fe[lt] tight when turning his neck."  (AR at 263.)  Dr. Le's physical examination revealed that Ling had a "normal range of motion for the cervical spine; supple neck and shoulder muscles; poor sitting posture with head thrust forward and rounded shoulders; [and] muscle stretch reflexes, manual muscle testing, and sensation for the bilateral upper extremities [ ] within normal

limits." *Id.* Dr. Le's assessment of Ling listed four of his "existing problems" (cervicalgia, cervical disc displacement, cervical facet syndrome, and cervical spine degenerative disc disease) as "improved" and one of his existing problems (lumbago) as "unchanged." (AR at 263.) Dr. Le ordered additional physical therapy and agreed that Ling should remain off work, in Dr. Le's words, "since 'he tells me that he can't look back to drive.'" (AR at 263.) Dr. Le ordered Ling to return in one month. (AR at 263.)

On November 7, 2011, Ling returned to see Dr. Le.[10] (AR at 265-66.) Dr. Le noted that "[t]he patient tells me his pain is better since his last appointment." (AR at 265.) Ling still reported an average pain of "4/10 where 10 is the worst possible pain." *Id.* Physical examination revealed a "cervical range of motion within normal limits; bilateral trapezius tender to palpation . . . lumbar right paraspinals tender to palpation." (AR at 265.) Ling was given a work excuse because he "state[d] it [wa]s still difficult to turn back to drive a [sic] work." (AR at 266.) Ling was instructed to return in one month. (AR at 266.)

On December 5, 2011, Ling returned to the Center for Spine, Joint and Neuromuscular Rehabilitation. (AR at 267-68.) It appears from the Administrative Record that Ling saw Nurse Practitioner Mamie Ruble and/or Dr. Damita Bryant. (AR at 267-68.) Ling gave an inconsistent report about his pain. On the one hand, Ling reported that (1) his pain medications were helping to lessen his pain, and (2) his physical therapy had greatly improved the "knot" in his lower cervical spine. (AR at 267.) On the other hand, Ling reported that (1) his pain was worse "due to the weather" and (2) his average pain was now "6/10 where 10 is the worst possible pain." (AR

_____

[10] It appears from the Administrative Record that this office visit may have been conducted by Nurse Practitioner Andrea Zarichnak in conjunction with or under the supervision of Dr. Le. (AR at 266.)

at 267.)  The medical team ordered a transcutaneous electrical stimulation unit.  (AR at 268.)

Ling was instructed to continue with his pain medication and physical therapy, and he was given

another note excusing his absence from work for thirty days and an appointment return date.

(AR at 268.)  The Administrative Record does not contain any additional details concerning

treatment by Dr. Le or his colleagues.

**C.     The Claims Process and Subsequent Medical Analysis**

Ling stopped working on May 20, 2011, and applied for, and received, short term

disability ("STD") benefits under the Plan through July 15, 2011.  In June 2011, Ling applied for

long term disability ("LTD") benefits under the Plan.  On July 15, 2011, Ling informed LINA

that he had been released to return to work without restrictions on July 18, 2011, and that he

planned to return to work on that day.  (AR at 60.)  As a result, on July 19, 2011, LINA closed

Ling's STD and LTD claims, believing that Ling would be back to work before the Elimination

Period expired.  (AR at 60.)  However, on July 28, 2011, Ling informed LINA that he had been

unable to return to work on July 18, 2011, "due to pain."  (AR at 56.)  LINA informed Ling that

it would re-open Ling's LTD claim if Ling provided additional medical records.  (AR at 56.)

Ling sent LINA additional records.

**1.     LINA's Review and Claim Denial**

LINA had two medical professionals review Ling's claim.  First, Chris Jordan, RN, Nurse

Case Manager, reviewed Ling's file for the purpose of "determin[ing] functional capacity."  (AR

at 54.)  Jordan's investigation note stated:  "[Office visit note] from spinal surgeon notes C5-6

disc degeneration and lumbar disk degeneration/ no [range of motion] deficits provided/ [range of

motion] noted from [physical therapy] 6/27/11 notes 100 percent all descriptions with exception

of left cervical rotation at 85 percent, refraction 75 percent and lumbar extension 75 percent/ no

[restrictions and limitations] for [return to work] . . ."  (AR at 54.)

Second, Stephanie Fannin, RN, performed a more in-depth review of Ling's file.  (AR at

47-52.)  Fannin first summarized a variety of Ling's diagnoses and treatments.  (AR at 50.)  She

then reviewed Ling's medical records, including MRI testing, physical therapy, doctors'

observations, and physical examinations regarding functional limitations.  (AR at 50.)  Fannin

then set forth in detail how she relied upon the records of Dr. Klekamp and Ling's physical

therapists in her analysis and stressed that they had not suggested any specific restrictions or

limitations for Ling.[11]  (AR at 52.)  Fannin concluded: "[b]ased on medical [evidence] presented

---

[11] Nurse Fannin's full summary comment was as follows:

> Based on medical [evidence] presented for review, it is insufficient
> to support a significant and/or continuous level of functional deficit
> to preclude claimant from returning to prior work duties from
> 5/21/11 to 8/19/11.  Office visit note from Dr. Klekamp dated
> 6/7/11 indicates the claimant seems and appears very comfortable
> in no distress at all.  He looks like he is in no pain at all.  He gets
> up from a seated position without any pain or encumbrances.  He
> walks down the hall in a nonantalgic gait.  He does not grimace.
> He does not appear to be in any pain.  Neurologic exam-deltoids,
> triceps, biceps, wrist extensor/flexor grip, EPL and interossei,
> iliopsoas, quads, hamstrings, TA, EHL, and gastrocsoleus 5/5.
> Range of motion of neck, mid-back and low back full range of
> motion.  On 7/1/11, Dr. Klekamp suggested the claimant return to
> work.  On 7/12/11, Dr. Klekamp's office visit note indicates the
> claimant requested to be off, but Dr. Klekamp felt he could return
> to work.  Current diagnostic tests on file do not indicate the
> presence of a nerve root impingement.  Range of motion
> measurements by physical therapist  on  6/13/11  are within
> functional limits.  Physical [t]herapy range of motion
> measurements provided on 7/6/11 Daily Treatment Note are
> Cervical AROM flexion 100 percent, Extension 100 percent, Right
> Rotation 100 percent, Left Rotation 100 percent, Lateral Flexion
> right 100 percent, Lateral Flexion Left 100 percent, Lumbar
> AROM flexion 100 percent, Extension 100 percent, Lateral Flexion

for review, it is insufficient to support a significant and/or continuous level of functional deficit to preclude claimant from returning to prior work duties from 5/21/11 to 8/19/11." (AR at 52.)

On August 17, 2011, after compiling these reviews, LINA denied Ling's claims. (AR at 47.) On that same date, LINA sent Ling a letter explaining its denial of benefits. (AR at 146-48.) The letter stated that Ling's LTD claim had been reviewed by a LTD Claim Manager, a Senior Claim Manager, and a Nurse Case Manager. (AR at 147). LINA further stated that it had reviewed, among other things, (1) medical records from Dr. Parsons and Dr. Klekamp for the time period of May 25, 2011 through July 15, 2011, and (2) physical therapy records from Star Physical Therapy for the time period of June 13, 2011 through July 6, 2011. (AR at 147.) After providing a more detailed breakdown of much of that information, LINA stated that "for a better understanding of [Ling's] medical condition, [his] file had been referred to [LINA's] Nurse Case Manager for review" and that she "opined that the medical documentation on file does not support significant functional deficits, restrictions, or limitations."[12] (AR at 147.) LINA

---

Right 100 percent, Lateral Flexion Left 100 percent. No specific restrictions and limitations were provided by the claimants care providers. Pain alone is not evidence of functional impairment. (AR at 52.)

[12] LINA explained the record support for its decision:

Office visit note from Dr. Klekamp dated June 7, 2011 indicates that you a [sic] very comfortable and in no distress at all. Your provider documented that you appeared to be in no pain at all. Your provided [sic] further noted that you appeared to get up from a seated position without any pain or encumbrances. Your range of motion of the neck, mid-back and low back were all documented to have full range of motion. On July 12, 2011 Dr. Klekamp's office visit note indicates that you requested to be off work but Dr. Klekamp documented that he felt you could return to work at this time. The current diagnostic tests on file do no [sic] indicate the presence of a nerve root impingement. Furthermore, range of

concluded by stating that "the documents on file are insufficient to support a significant or continuous level of functional impairment which would preclude you [from] performing the material duties of your occupation throughout your elimination period."  (AR at 147.)

LINA advised Ling that he could appeal and include in that appeal "written comments as well as any new information" that he wished LINA to consider.  (AR at 148.)  LINA also advised Ling that he could submit "additional information," such as medical records, diagnostic test results, treatment plans, or limitations and restrictions on his ability to perform the duties of his occupation.  (AR at 148.)  Meanwhile, Ling remained on leave under the federal Family and Medical Leave Act ("FMLA").  AWG terminated Ling on December 8, 2011, when he did not return to work upon the expiration of his FMLA leave.  (*See* Docket No. 25 at p. 3.)

## 2. Ling's Appeal

On January 4, 2012, Ling appealed LINA's denial of LTD benefits.  (AR at 236-43, 248.) In support of the appeal, Ling submitted to LINA an independent medical examination performed on January 18, 2012 by Dr. Robert P. Landsberg of Rivergate Sports Medicine and Orthopedic Surgery, P.C., for workers' compensation purposes.  (AR at 237-43.)  Dr. Landsberg's report explains that he was provided with a wide variety of Ling's medical records from 1998 through 2011.  (AR at 238-41.)  Some of the medical records from 2011 that were provided to Dr. Landsberg were not provided to LINA and are not part of the Administrative Record, including

---

motion measurements documented by physical therapist on June 13, 2011 are within functional limits and range of motion measurements provided on July 6, 2011 show no lack of physical deficits which would preclude you from performing your occupation.  No specific restrictions or limitations were provided by your providers.

(AR at 147.)

records of visits to Dr. John Pope in April 2011 and Dr. Thomas Struble in May of 2011. (AR at 238-39.)

Dr. Landsberg conducted a physical examination of Ling. (AR at 241-42.) Dr. Landsberg began by noting that Ling appeared "in some distress with neck and low back problems" but was "in no acute distress." (AR at 241.) With respect to the cervical spine, Dr. Landsberg found that Ling had "tenderness in the posterior cervical spine into the paraspinal muscles with mildly decreased range of motion in all directions at the extremes but no muscle spasms. There is just mild guarding with the extremes of range of motion. Neurologically he is intact in the upper extremities except for a mildly decreased left brachiordialis and biceps reflex but normal strength and sensation." (AR at 242.) Regarding the lower back, Dr. Landsberg found that Ling was "tender in the lumbar spine but not into the buttocks or sacroiliac area. Trendelenburg is negative.[13] Flexion has his fingertips reaching the ankle level producing some pulling in the low back and posterior thighs. Extension produces low back pain. Lateral flexion is okay and heal-toe walking is satisfactory. Neurologically he is intact in the lower extremities." (AR at 242.) Dr. Landsberg described Ling's diagnosis as "low back pain and neck pain with degenerative disc disease and lumbar spinal stenosis."[14] (AR at 242.)

In the discussion section of his report, Dr. Landsberg opined that Ling's "neck and low back problems were definitely aggravated and advanced by his repetitive work activities over

---

[13] The Trendelenburg's Sign is found in people with weak or paralyzed abductor muscles of the hip, which are important during the standing phase of the gait cycle to maintain both hips at the same level. It is used to test hip stability and assess limb conditions. *See* DICTIONARY OF SPORT AND EXERCISE SCIENCE AND MEDICINE (2008), available at http://medical-dictionary.thefreedictionary.com/Trendelenburg+sign (last accessed September 8, 2015).

[14] Stenosis is another term for foraminal narrowing. *See* footnote 6, *supra*.

many years at [AWG]," including "lifting, twisting, and turning." (AR at 242.) Dr. Landsberg noted that the stand-up forklift, in use since 2008, required these types of activities. (AR at 242.) Based on his analysis, Dr. Landsberg concluded that Ling is left with a permanent partial impairment rating under the rating system normally employed for workers' compensation purposes. (AR at 242.) First, based in part on "non-verifiable radicular complaints," the fact that he "does not have any radicular findings," his "relatively normal neurological status," and the fact that he "has some stiffness," Dr. Landsberg concluded that Ling had a three percent impairment related to his cervical spine. (AR at 242.) Second, based again in part on the fact that Ling "does not have any true radicular complaints or findings," as well as his diagnosis of spinal stenosis, Dr. Landsberg concluded that Ling had an eight percent impairment related to his lumbar spine. (AR at 243.) Dr. Landsberg therefore concluded that Ling had a combined whole person impairment of eleven percent. (AR at 243.)

Based on these conclusions, regarding the lumbar spine, Dr. Landsberg recommended restrictions of no standing, walking, or sitting for more than thirty minutes at one time (and that activities should be alternated). (AR at 243.) Dr. Landsberg stated that Ling could lift up to a maximum of thirty pounds and occasionally up to fifteen or twenty pounds, but that Ling should not engage in repetitive lifting, bending or stooping. (AR at 243.) Regarding the cervical spine, Dr. Landsberg recommended "no prolonged looking up or down or to either side with no repetitive flexion, extension and rotation, and careful with lifting above the shoulder level." (AR at 243.)

After receiving Dr. Landsberg's report, LINA requested that Ling's file be reviewed by

an independent peer reviewer.[15]  (AR at 141.)  On March 6, 2012, Dr. Kenneth Palmer, a

consulting board certified orthopedic surgeon, reviewed Ling's file.[16]  (AR at 228-32.)  Palmer

reviewed all of Ling's medical treatment records previously available to LINA, as well as Dr.

Landsberg's 2012 report.  (AR at 228.)  In response to the question "[a]re the restrictions and

limitations supported by the clinical findings in the medical documentation provided for review

from 5/21/11 to 8/19/11 and continuing?", Dr. Palmer responded:

> [b]ased on the medical records reviewed, the restrictions and
> limitations are not supported by the clinical findings in the medical
> documentation provided for review from 5/21/11 to 8/19/11 and
> continuing.  The claimant has been seen by treating providers for
> neck and low back complaints.  He has a history of lumbar
> laminectomy in the remote past.  There is noted to be considerable
> variation in the pain pattern, location, and intensity.  There are
> limited examination findings, which are insufficient to support the
> restrictions and limitations submitted.

(AR at 231.)  Later in the same report, however, Dr. Palmer stated that "the restrictions and

limitations submitted on 1/18/2012 by Dr. Robert Landsberg would be appropriate . . . [t]he

claimant has ongoing neck and back pain complaints that correlate with the significant pathology

noted on his imaging studies."  (AR at 231.)

---

[15] The AR reflects that, prior to this request, LINA Nurse Case Manager Chris Jordan
reviewed Ling's file again on January 12, 2012.  (AR at 40.)  The internal note recorded by
Jordan states "no medical records for continuous support of medical deficits beginning from
incur date/new medical does not change prior functional assessment."  (AR at 40.)  Because the
entry was made one week prior to the submission of Dr. Landsberg's report, it is unclear whether
this note was intended to mean that no materials had been received or that materials other than
Dr. Landsberg's report had been received, reviewed, and found unpersuasive.  If it is the latter,
the entry does not cite to those materials, nor do the parties make reference to their location in
the Administrative Record.

[16] Dr. Palmer's report certifies that he has no professional or financial relationship with
LINA and states that he does not accept compensation that is dependent in any way on the
specific outcome of this case.  (AR at 232.)

On March 21, 2012, Dr. Palmer's report was reviewed at LINA by Kem Lockhart, RN. (AR at 28.) Lockhart identified a need for clarification by Dr. Palmer – specifically, between the rejection of the restrictions and limitations of Ling in one aspect of Dr. Palmer's report but the apparent approval of Dr. Landsberg's conclusion in another. (AR at 28.) Lockhart also asked Dr. Palmer, if he found Dr. Landsberg's restrictions and limitations to be supported, to clarify the time period that he felt was relevant to those restrictions. (AR at 28.) On March 28, 2012, Dr. Palmer issued a supplemental report in response to LINA's request for clarification. (AR at 221-26.) In his supplemental report, Dr. Palmer clarified that "the restrictions and limitations are not supported by measured limitations from 05/21/2011 through 08/19/2011 and from 08/20/2011 to 01/17/2012" because, "[a]lthough the claimant was seen by numerous providers for neck and low back complaints, there is considerable variation in the pain pattern, location, and intensity. Examination findings are limited and the information appears to be based on the claimant's self-report. This is insufficient information to support total work restrictions and limitations." (AR at 225.) Dr. Palmer further clarified that Dr. Landsberg "indicated on 1/18/2012 that the claimant has functionality but would require modification to the workday. These restrictions and limitations are appropriate for three to six months, with re-evaluation at that time to evaluate improvements in functionality." (AR at 225.)

### 3.    LINA's Denial of Ling's Appeal

On April 16, 2012, LINA denied Ling's appeal. On that same date, LINA sent Ling a letter explaining its denial. (AR at 137-39.) LINA stated that, upon review of his record in its entirety, without deference to prior reviews, it had concluded that Ling's medical conditions did not rise to a level of severity that precluded performance of his regular occupation during the Elimination Period. (AR at 138.) The letter stated that Ling's LTD claim appeal had been

reviewed by an Appeal Specialist, a Senior Appeal Specialist, and Dr. Palmer.  (AR at 138.)

LINA further explained its decision:

> Although you were seen by numerous medical providers for neck and low back complaints, there is considerable variation in your reported pain pattern, location, and intensity of your pain. Examination provided limited findings of loss of function and the information appears to be based on your self report.  This information does not support your inability to work at your Regular Occupation.  While we understand that your examination of January 18, 2012, indicated some evidence of functional deficits, this information is not time concurrent with the date of your claim and does not support your inability to work at your Regular Occupation from May 21, 2011 through August, 2011 and continuing to the present. . . . Disability is determined by medically supported limitations and restrictions which would preclude you from performing the duties of your occupation as a Forklift Operator from your last day worked through the end of the Elimination Period.  We do not dispute that you may have been somewhat limited or restricted due to your subsequent diagnoses and treatment; however, an explanation of your functionality and how your functional capacity continuously prevented you from performing the material duties of your occupation from May 21, 2011 through August 19, 2011, and beyond was not clinically supported.  The presence of a condition, diagnosis or treatment does not necessarily equate to a presence of a disabling condition or decreased level of functionality.  As such, we are affirming our decision of August 17, 2011 . . ."

(AR at 138-39.)  LINA again advised Ling that he could appeal and include in that appeal

"written comments as well as any new information" that he wished LINA to consider.  (AR at

139.)  LINA also advised Ling that he could submit "additional information," such as medical

records, diagnostic test results, treatment plans, or limitations and restrictions on his ability to

perform the duties of his occupation.  (AR at 139.)

### 5.        Subsequent Events Including Ling's Second Appeal

On May 26, 2012, the U.S. Social Security Administration ("SSA") awarded Ling Social

Security Disability Income benefits.  (AR at 207.)  In doing so, the SSA determined that Ling

"became disabled as of 3/5/2012, the date [he] turned 55 years old," and stated that "[t]his is the earliest date the records show [his] condition was severe enough to keep [him] from working." (AR at 205.)  The SSA further noted that Ling's condition was "not severe enough to keep [him] from working as far back as 5/20/10."  (AR at 205.)

Ling subsequently advised LINA that he wished to pursue another voluntary appeal.[17]  In support, Ling submitted a report dated January 9, 2013, that had been prepared for workers' compensation purposes by vocational expert John W. McKinney, III, CRC, CVE, LPC.  (AR at 199-203.)  McKinney noted Ling's employment history with AWG and also explained that Ling had been performing 10-15 hours of "limited work demands" for Franklin Motors for the last ten years up through the present time.  (AR at 201.)  McKinney reviewed Ling's medical history, and made note of the fact that, in 2012, Dr. Klekamp "noted that he could not state within a reasonable degree of medical certainty whether Mr. Ling's medical conditions arose out of his work activities."  (AR at 201.)  McKinney recorded Ling's subjective reports of, *inter alia*, chronic pain of moderately severe to severe intensity in his neck, poor balance, persistent muscle spasms, significantly altered gait, intolerable symptoms with any physical activity or weather conditions, and "unrelenting pain."  (AR at 202.)  However, McKinney noted that Ling was not using narcotic pain medication.  *Id.*  McKinney concluded that, "based upon the work restrictions advised by Dr. Landsberg," Ling would not be able to return to his former job in the future.  (AR

_____

[17] The next two paragraphs of the factual summary are derived from the Administrative Record.  Ling's brief states that what occurred during this period of time is "a bit ambiguous" and that "Ling inquired about the prospect of a voluntary second appeal although he did not formally pursue this option.  Nevertheless, it would appear that LINA might have treated his inquiry as an actual appeal . . ."  (Docket No. 25 at pp. 9-10.)  The court finds Ling's commentary curious given the record.  However, it is of no moment to the outcome of the instant motion.

at 202.)  McKinney concluded, therefore, that Ling was "100% vocationally disabled . . . and [wa]s not considered a viable candidate for retraining assistance in the future given the marginal likelihood of a successful outcome regarding actual job placement and maintenance."  (AR at 202-03.)

On January 11, 2013, Ling called LINA to advise it that he was waiting to receive information that the SSA had used in making its benefits determination so that Ling could provide that material to LINA as part of his appeal.  (AR at 16.)  LINA provided Ling with a thirty day extension of the appeal deadline to submit the information.  (AR at 16, 132.)  After Ling missed the February deadline, LINA contacted him; Ling informed LINA that he was still waiting for the materials from the SSA.  (AR at 12.)  On March 11, 2013, LINA informed Ling that it was removing his claim from review to give him the opportunity to obtain the additional records for his appeal.  (AR at 130.)  LINA did not hear from Ling again.  On August 7, 2013, Ling's attorney called LINA and inquired as to the status of the appeal.  (AR at 11.)  According to the internal record of the call, LINA advised counsel that the appeal had been removed because Ling was trying to obtain records from the SSA but, if Ling wanted to resubmit the appeal, then LINA would determine whether it could be accepted.  (AR at 11.)  Ling never resubmitted the appeal.

E.    **Procedural History**

On August 22, 2013, Ling filed the Complaint.  (Docket No. 1.)  On November 1, 2013, LINA filed its Answer.  (Docket No. 8.)  On November 27, 2013, LINA filed the Administrative Record.  (Docket No. 12.)  On January 22, 2015, LINA filed the Motion for Judgment on the Administrative Record.  (Docket No. 15.)  On April 21, 2015, after several continuances granted

by the court, Ling filed his Response.[18]  (Docket Nos. 24, 25.)  On May 7, 2015, LINA filed its

Reply.  (Docket No. 26.)

## **LEGAL STANDARD**

Under ERISA, "if the benefit plan gives the [claim] administrator discretionary authority

to determine eligibility for benefits or to construe the terms of the plan," this court must apply an

arbitrary and capricious standard in reviewing the claim administrator's decision.  *Miller v.*

*Metro. Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991) (citing *Firestone Tire & Rubber Co. v.*

*Bruch*, 489 U.S. 101, 115 (1989)).  Plan language indicating that a claimant must provide

"satisfactory" proof to the claim administrator establishes the discretionary authority to trigger

review of a claim under the arbitrary and capricious standard.[19]  *See Miller*, 925 F.2d at 983-84

---

[18] The first two of the court's three Orders pertaining to Ling's extensions expressly
granted an extension as to Ling's response to LINA's Motion for Judgment.  (*See* Docket No. 17,
21.)  The third Order, while phrased in more general terms, should have been understood in the
context of the prior two Orders.  (Docket No. 23.)  Instead of filing a document labeled a
Response, however, Ling filed a document styled as his own Motion for Judgment.  LINA,
assuming the court would construe Ling's filing as the awaited response to its original motion,
filed its Reply.  The court does construe Ling's filing as a Response in keeping with its prior
Orders.  In the end, however, as discussed *infra*, this is an academic point because LINA's
motion will be granted, and, accordingly, to the extent there is any motion for judgment for Ling
on the docket it will be terminated as moot by the operation of this decision.

[19] The Supreme Court in *Firestone* did not suggest that "discretionary authority" hinges
on incantation of the word "discretion" or any other "magic word."  *Perez v. Aetna Life Ins. Co.*,
150 F.3d 550, 555 (6th Cir. 1998) (*en banc*) (citing *Johnson v. Eaton Corp.*, 970 F.2d 1569, 1572
n.2 (6th Cir.1992) and *Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1453 (D.C. Cir.1992)).
"Rather, the Supreme Court directed lower courts to focus on the breadth of the administrators'
power – their 'authority to determine eligibility for benefits or to construe the terms of the
plan.'"  *Block*, 952 F.2d at 1453 (quoting *Firestone*, 489 U.S. at 115).  While "magic words" are
unnecessary to vest discretion in the plan administrator and trigger the arbitrary and capricious
standard of review, the Sixth Circuit has consistently required that a plan contain "a clear grant
of discretion [to the administrator] to determine benefits or interpret the plan."  *Wulf v. Quantum*
*Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994); *see also e.g., Tiemeyer v. Cmty. Mut. Ins. Co.*,
8 F.3d 1094, 1099 (6th Cir. 1993) (absence of a clear grant of discretion dictates a *de novo*
standard of review); *Anderson v. Great West Life Assurance Co.*, 942 F.2d 392, 395 (6th Cir.

(finding plan language requiring "medical evidence satisfactory to the Insurance Company" to a be a sufficient grant of discretion); *Perez,* 150 F.3d at 555 (concluding sufficient discretion existed where plan stated that insurer had "right to require as part of the proof of claim satisfactory evidence"); *Yeager v. Reliance Std. Life Ins. Co.*, 88 F.3d 376, 380-81 (6th Cir. 1996) (concluding a sufficient grant of discretion was created by language requiring "satisfactory proof of Total Disability to us"); *see also Fendler v. CNA Group Life Assur. Co.*, 247 F. App'x 754, (6th Cir. 2007) (noting that the Sixth Circuit also finds discretion to be established by a "due proof" requirement); *Leeal v. Cont'l Cas. Co.*, 17 F. App'x 341, 343 (6th Cir. 2001) (same).

"The arbitrary or capricious standard is the least demanding form of judicial review of administrative action." *Davis By and Through Farmers Bank and Capital Trust Co. of Frankfort, Ky. v. Ky. Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)). Under this standard, the determination of an administrator will be upheld if it is "rational in light of the plan's provisions." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014) (citing *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 457 (6th Cir. 2003); *Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998)); *Shelby Cnty. Health Care Corp. v. S. Council of Indus. Workers Health and Welfare Trust Fund*, 203 F.3d 926, 933-34 (6th Cir. 2000) (citation omitted). Stated differently, a claim administrator's decision is not arbitrary and capricious if it "is based on a reasonable interpretation of the plan." *Johnson v. Eaton Corp.*, 970 F.2d 1569, 1574 (6th Cir. 1992).

While this review is "not without some teeth, it is not all teeth." *McClain*, 740 F.3d at

---

1991) (same).

1064. "A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from a deliberate principled reasoning process and is supported by substantial evidence." *Id.* (citing *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *McClain*, 740 F.3d at 1065 (citing *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003)).[20] Moreover, a court must accept an administrator's rational decision, if it is not arbitrary or capricious, even in the face of an equally rational interpretation of a plan offered by a participant. *Gismondi v. United Tech. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005) (citing *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004)).[21]

## ANALYSIS

---

[20] When reviewing a denial of benefits under ERISA, a court may consider only the evidence available to the administrator at the time the final decision was made. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998). Above all, the court is not to substitute its own judgment for that of the plan administrator. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

[21] In *Firestone*, the Supreme Court noted that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" 489 U.S. at 109 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)). "There is an actual, readily apparent conflict . . . , not a mere potential for one," when the company or plan administrator is the insurer that ultimately pays the benefits." *Killian v. Healthsource Provident Admins., Inc.*, 152 F.3d 514, 521 (6th Cir. 1998). Where this is the case, as it is here, notwithstanding the deferential standard, courts must be aware of the conflict of interest and consider it as a factor in determining whether the decision to deny benefits was arbitrary and capricious. *Gismondi*, 408 F.3d at 298; *see also Borda*, 138 F.3d at 1069 (noting that "the abuse of discretion or arbitrary and capricious standard still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest") (quoting *Miller*, 925 F.2d at 984). While the court proceeds to review LINA's denial of benefits under the arbitrary and capricious standard, it does so with the recognition that "LINA has a significant financial incentive to terminate coverage or deny a claim." *Allen v. Life Ins. Co. of N. Am.*, 504. F. App'x 435, 440 (6th Cir. 2012).

Under the terms of the Plan, Ling had to provide LINA with satisfactory proof that he was continuously unable to perform all of the material duties of his regular, medium-duty occupation throughout his ninety-day Elimination Period, which ran from May 21, 2011 to August 19, 2011. Based on its interpretation of the Plan and review of Ling's medical evidence, LINA determined that Ling had not met this burden. Based on an analysis of the records submitted by Ling to LINA, even when the court considers LINA's conflict of interest, LINA's denial of benefits survives Ling's challenge because LINA's decision was rational and reasonable and supported by the evidence.

First, Ling's primary treating physician during the Elimination Period, Dr. John Klekamp, repeatedly documented his hesitation regarding Ling's subjective complaints of pain and claims of disability, including observations at multiple visits that Ling appeared in little or no pain at all. Dr. Klekamp ordered and reviewed two MRIs while evaluating Ling, and he saw no issues of significant concern in either, including no area of significant nerve impingement. On multiple occasions, Dr. Klekamp also expressed the belief that Ling could return to work, even going so far as to document that he had personally struggled with the decision to excuse Ling before he "relented" under pressure. Indeed, *every single time* that Dr. Klekamp saw Ling in June and July of 2011, he recorded his belief that Ling could and should return to work. The fact that Ling does not address Dr. Klekamp in his Response is telling; Dr. Klekamp's substantial evidence alone provides a rational basis for LINA's denial of Ling's claim. (*See generally* Docket No. 25.)

Second, Ling gave inconsistent reports of the intensity and location of pain to his physical therapist and his pain management doctor. On numerous occasions in June and July of 2011,

Ling's physical therapist recorded that Ling reported "no pain" or only "soreness" or "stiffness" in different parts of his body.  In addition, Ling was able to pursue a rigorous physical therapy program during which he frequently had no complaints of pain.  On July 6, 2011, Ling reported to his physical therapist that he had "no pain in turning his head."  Soon after, however, Ling was making different pain complaints to Dr. Le.  Moreover, Ling told Dr. Le the opposite about his neck – namely, that he "[couldn't] look back to drive" due to pain – and this was the reason that Dr. Le excused Ling from work.[22]

Third, the objective testing that was performed by Ling's physicians, discussed at length *supra*, consistently demonstrated a full, normal range of motion.  Dr. Klekamp's physical examinations found full range of motion in Ling's back, mid-back, and low back.  Ling's physical therapist stated that Ling's range of motion in his cervical and lumbar spine were 100% except for ninety percent in cervical retraction at the end of his treatment.  Dr. Le also reported normal range of motion in Ling's cervical spine and shoulders.  Numerous other objective tests performed on Ling (Spurling's, Lhermitte's, x-rays looking for multilevel cervical degenerative changes, reflexes, sensations, manual muscle testing) had normal or age-appropriate results.

Fourth, three medical reviewers evaluated Ling's records and determined that he was not functionally restricted from working.  Chris Jordan, RN, and Stephanie Fannin, RN, of LINA, both concluded that there was insufficient medical evidence to support Ling's disability throughout the Elimination Period.  Fannin additionally noted that pain alone was not evidence of

---

[22] The court also notes that, at the same time that Ling was making complaints of pain and inability to work to Dr. Le, he was, as reflected in his self-reporting to McKinney, working ten to fifteen hours per week light duty at Franklin Motors.  The vocational expert reported that Ling was engaged in light duties that included "running errands, picking up mails, making bank deposits, etc."  (AR at 201.)  It is possible that these tasks involved driving.

functional impairment.  Finally, LINA retained Dr. Palmer to perform an independent review of

Ling's claim.  Dr. Palmer opined that "the restrictions and limitations are not supported by

measured limitations from 05/21/2011 through 08/19/2011 and from 08/20/2011 to 01/17/2012"

because "[a]lthough the claimant was seen by numerous providers for neck and low back

complaints, there is considerable variation in the pain pattern, location, and intensity."  (AR at

225.)  Dr. Palmer further stated that "[e]xamination findings are limited and the information

appears to be based on the claimant's self-report.  This is insufficient information to support total

work restrictions and limitations."  (AR at 225.)  Based on Dr. Landsberg's subsequent January

18, 2012, examination of Ling, which occurred six months after the Elimination Period, Dr.

Palmer stated that, from that date forward, "the restrictions and limitations submitted on

1/18/2012 by Dr. Robert Landsberg would be appropriate . . . for three to six months, with

re-evaluation at that time to evaluate improvements in functionality."[23]  (AR at 225.)

The court cannot say that LINA was irrational or unreasonable in the way it assessed this

information in the Administrative Record.  To the contrary, reports from Ling's own physician,

physical therapist, and objective testing support the conclusion that Ling was not fully disabled

throughout the Elimination Period and could have returned to work.  It is not unreasonable for

LINA to have questioned the necessity of the work excuses given by Dr. Le in the face of

contradictory evidence and Dr. Le's admitted reliance on Ling's self-reporting, especially where

---

[23] LINA also relies upon the fact that the SSA did not find Ling to have a condition severe
enough to keep him from working until March 5, 2012, nearly one year after the Elimination
Period expired.  The court mentions this for the sake of completeness but does not afford it much
weight.  While the SSA's determination is part of the Administrative Record, it is not clear that
Ling ever submitted the documents that were before the SSA to LINA before withdrawing his
second appeal and instituting this lawsuit.  In addition, the SSA's disability determinations are
not based on the same standards as those at issue here.

Dr. Klekamp's observations were supported by mild to moderate MRI results, highly successful objective testing, and positive physical observations. *See Allen v. Life Ins. Co. Of N. Am.*, 504. F. App'x 435, 440 (6th Cir. 2012) (holding that, where conflicting medical evidence exists, the claims administrator is not required to rely solely on one opinion over another). The restrictions and limitations recommended by Dr. Landsberg on January 18, 2012, and noted by Dr. Palmer in his supplemental report to LINA fell outside the Elimination Period, and thus do not definitively support the conclusion that Ling was continuously disabled after the claimed date of liability, May 20, 2011, as required by the Plan's Elimination Period. Morever, the reports of Dr. Landsberg and McKinney were prepared for other purposes with evidence not necessarily supplied to LINA, and it was therefore not unreasonable for LINA to balance their contents with the body of other available evidence. In sum, LINA's final determination "adequately reflected the quality and quantity of medical evidence it received from" Ling. *Id.*

Ling's arguments to the contrary are unavailing. Ling contends that LINA acted arbitrarily and capriciously in several ways related to its partial reliance upon the report of Dr. Palmer. First, Ling argues that LINA acted improperly by asking Dr. Palmer to clarify his first report – suggesting that LINA "signaled" that Dr. Palmer's first report "was not what [LINA] wanted." (Docket No. 25 at p. 10.) As discussed *supra*, Dr. Palmer's initial report appeared to have an internal inconsistency. Accordingly, LINA asked for clarification, and Dr. Palmer then filed a supplemental report that LINA relied upon. In short, Dr. Palmer's clarification was not suspicious, given the context of his first report, and it does not suggest a shift in result that was signaled by LINA.

Ling argues that Dr. Palmer's concession that, while not appropriate earlier, restrictions

and limitations may have been appropriate for Ling in 2012 (based on Dr. Landsberg's January 18, 2012 report) was irrational because "nothing medically significant happened on January 18, 2012, other than this [wa]s the day when Dr. Landsberg issued his report." (Docket No. 25 at p. 10.)  However, something significant did happen on January 18, 2012 – Dr. Landsberg physically examined Ling.  It is certainly plausible that Dr. Landsberg could have concluded, upon physical examination in January 2012, that it was *then* appropriate for Ling to have restrictions and limitations (despite Dr. Landsberg's finding Ling to be in "no acute distress," to not have "any true radicular complaints or findings," and to be only 11% disabled).  It was therefore not unreasonable for Dr. Palmer to have cited Dr. Landsberg's January 18, 2012 report in agreeing that restrictions might be appropriate going forward (but adding that they should be revisited in three to six months).  Most importantly, however, in neither of his reports did Dr. Palmer explicitly conclude that Ling was unable to work *prior* to Dr. Landsberg's examination (*i.e.*, during the Elimination Period).  It was also not unreasonable for LINA to consider the date of Dr. Landsberg's examination of Ling in affording weight to his findings, and to afford greater significance to the treatment and diagnostic tests conducted during the Elimination Period in 2011.

Ling briefly argues three other points.  First, Ling suggests that there is an "obvious inconsistency" between Dr. Palmer's acknowledgment of Ling's prior MRI results and his conclusion that there was "insufficient information to support total work restrictions and limitations" prior to January 18, 2012.  (Docket No. 25 at p. 10.)  Ling's implication appears to be that the very existence of Ling's MRI results required a conclusion of "sufficient information" and, therefore, invalidated Dr. Palmer's opinion.  But this is not Ling's judgment to make.  It is

rational that LINA could have reconciled these two statements as Dr. Palmer's acknowledging

the existence of the MRI results but, as Dr. Klekamp did before, concluding they were not

enough evidence to support Ling's desired result.[24]  Second, Ling argues that Dr. Palmer's

assessment is "misplaced" and "irrelevant" because Dr. Palmer stated that there was "insufficient

information to support total work restrictions and limitations," rather than explicitly stating that

Ling could not meet the physical demands of a forklift operator.  (*Id*.)  However, the records

provided to Dr. Palmer informed him that Ling was a forklift operator.  Dr. Palmer's decision to

not explicitly restate Ling's position in the quoted sentence does not make LINA's reliance on

Dr. Palmer's evaluation arbitrary and capricious.  Ling cannot shift the burden of demonstrating

that he could not perform the position of forklift operator onto LINA and Dr. Palmer.  *See Likas*

*v. Life Ins. Co. of N. Am.*, 222 F. App'x 481, 487 (6th Cir. 2007) ("Where an insurance policy

places the burden of proving disability on a disabled employee, the employee cannot then shift

this responsibility to the insurance company.").  Third, Ling suggests in his Response that, after

his initial appeal, LINA may have reviewed his second appeal under the "any occupation"

standard as opposed to the "own occupation" standard, which would have been inappropriate.

---

[24] Ling also contends that Dr. Palmer's statement that "the claimant has ongoing neck and
back pain complaints that correlate with the significant pathology noted on his imaging studies,"
(AR at 224), which refers to MRIs obtained in July 2011, must mean that "Ling's disabling
impairments were present before his benefits waiting period expired."  (Docket No. 25 at p. 11.)
However, Dr. Palmer's statement that there is pathology on Ling's MRI results is essentially
undisputed – as discussed *supra*, Ling's MRI results showed mild to moderate disc bulges and
foraminal narrowing.  While these findings may have correlated to pain, as reflected in the notes
of Dr. Le, they were not necessarily disabling impairments.  Indeed, Dr. Klekamp interpreted the
MRI results and found no issues of significant concern regarding the pathology noted therein
aside from a self-reported need for pain management (about which Dr. Klekamp himself
expressed hesitation).  This sentence in Dr. Palmer's report does not somehow render Ling's MRI
results dispositive of his disability claim, nor does it preclude LINA from being entitled to
reasonably rely on Dr. Klekamp's observations regarding the severity of Ling's MRI results.

(*See* Docket No. 25 at p. 9.)  The Administrative Record, however, reflects that this is incorrect. LINA removed Ling's second appeal from review to give Ling the opportunity to submit additional records, and it was never decided before this action was filed.  (AR at 130, 11.)

In short, Ling has not offered a sufficient explanation as to why LINA's reliance on the medical evidence of Ling's own treating physician, Ling's physical therapists, Ling's objective testing, LINA's internal medical reviewers, and LINA's independent peer medical reviewer was arbitrary and capricious.  Ling's arguments about Dr. Palmer's opinion and Dr. Landsberg's 2012 report miss the mark because (1) Dr. Landsberg does not conclusively establish that Ling was disabled during the Elimination Period and (2) LINA was entitled to reasonably choose among available medical opinions based on the weight of the evidence.[25]  If LINA's determination is the result of a deliberate, principled reasoning process and is supported by substantial evidence, then the court must uphold it.  *McClain*, 740 F.3d at 1064-65.  The court finds that, even if there were legitimately competing views as to the degree of Ling's disability, LINA acted rationally in its review of the Administrative Record and weighing of the medical evidence.  Giving LINA the proper deference, the court finds that its determination was not unreasonable.  Accordingly, the court will uphold LINA's decision to deny Ling's claim for LTD benefits.

## CONCLUSION

For the foregoing reasons, the defendant's Motion for Judgment on the Administrative

---

[25] As discussed *supra* footnote 21, the court has borne in mind LINA's significant financial incentive to deny Ling's claim.  However, the court finds that Ling has offered no credible evidence that the conflict of interest present here resulted in unfair bias.  *Cf. Allen*, 504 F. App'x at 440 (finding credible allegations of a conflict of interest bias where insurance company denied coverage despite findings of Lyme disease and disability supported by it own medical experts).

Record (Docket No. 15) will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge